132 F.3d 463
 97 Cal. Daily Op. Serv. 9421, 97 Daily Journal
D.A.R. 15,151
Paris Hoyt CARRIGER, Petitioner-Appellant,
v.
Terry L. STEWART, Director of the Arizona Department of
Corrections, Respondent-Appellee.
 No. 95-99025.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 27, 1997.
Decided Dec. 17, 1997.
 
 Denise I. Young, Arizona Capital Representative Project, Tempe, Arizona, for petitioner-appellant.
 Joseph T. Maziarz, Assistant Attorney General, Phoenix, Arizona, for respondent-appellee.
 Appeal from the United States District Court for the District of Arizona; Paul G. Rosenblatt, District Judge, Presiding. D.C. No. CV-95-01617-PGR.
 Before: HUG, CHIEF JUDGE, BROWNING, SCHROEDER, FARRIS, PREGERSON, REINHARDT, KOZINSKI, FERNANDEZ, T. G. NELSON, KLEINFELD, and THOMAS, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 INTRODUCTION
 
 1
 Paris Hoyt Carriger was convicted and sentenced to death for the brutal murder of Robert Shaw in 1978. Shaw was beaten on the head with a skillet and strangled with his own necktie during a robbery of his Phoenix jewelry store. The chief prosecution witness was Robert Dunbar; Carriger's defense was that Dunbar committed the murder.
 
 
 2
 After the trial and unsuccessful appeal, Carriger learned of documents in the state's records, never disclosed before trial, indicating that Dunbar was a known habitual liar accustomed to blaming others for his own crimes. In our first en banc opinion in the case, we held that Carriger's challenge to his counsel's failure to investigate Dunbar's background came too late. Carriger v. Lewis, 971 F.2d 329, 333 (9th Cir.1992) (en banc).
 
 
 3
 After Carriger's first federal habeas corpus petition had been filed, Dunbar actually confessed in open court that he was the murderer and that Carriger was innocent. Despite the passage of a decade since Dunbar's sworn confession, and despite numerous attempts by Carriger to raise the issue, we have not yet considered on the merits the effect of Dunbar's sworn confession on Carriger's continued incarceration and sentence of death.
 
 
 4
 This habeas proceeding concerns whether Carriger has adequately shown either actual innocence that would foreclose imposition of the death penalty, or sufficient doubt about his guilt to overcome procedural bars and permit consideration of the merits of his constitutional claims of trial error. The district court and the panel said no. We took the case en banc because of the exceptional importance of the issues concerning whether the state may execute an individual whose guilt is shrouded by doubt and who has raised serious claims of constitutional error at trial. We now hold that we must consider Carriger's claims, and that those claims warrant a new trial.
 
 I. Procedural History
 A. Trial and Sentencing
 
 5
 Carriger was tried in July 1978. The physical evidence at trial was not strong. The prosecution's case relied principally on the testimony of Robert Dunbar, who had contacted police the morning following the murder with an offer of information in exchange for immunity. With immunity, Dunbar testified that Carriger had confessed the crime to him immediately after it happened, had described the crime in considerable detail, and had sought Dunbar's help to dispose of the loot and evidence. Nearly all of the physical evidence used at trial was evidence to which Dunbar had led police the morning following the crime.
 
 
 6
 Carriger was convicted of robbery and murder. His counsel later testified in postconviction proceedings that during his investigation and trial preparation he did not take into account that his client faced the death penalty. At the sentencing phase, counsel presented no mitigation case. The trial judge sentenced Carriger to 99-100 years for the robbery and death for the murder.
 
 B. Appeal
 
 7
 Following sentencing, Carriger dismissed his lawyer and was appointed new counsel. On appeal, Carriger challenged a number of evidentiary rulings, trial counsel's effectiveness in cross-examining Dunbar, and the constitutionality of Arizona's death penalty statute. The Arizona Supreme Court affirmed. See State v. Carriger, 123 Ariz. 335, 599 P.2d 788 (1979) (Carriger I ).
 
 C. 1982 State Postconviction Proceedings
 
 8
 In 1982, represented by new counsel, Carriger filed his first petition for state postconviction relief. The judge who had presided at Carriger's trial denied the petition without a hearing. On appeal, the Arizona Supreme Court found that Carriger's counsel at sentencing had been ineffective, and ordered a new sentencing hearing. See State v. Carriger, 132 Ariz. 301, 645 P.2d 816, 820 (1982) (Carriger II ). The court also ordered that Carriger be given a hearing on his other postconviction claims. See id.
 
 
 9
 Carriger's principal postconviction claim was that his trial counsel had been ineffective for failing to investigate Dunbar adequately and for failing to obtain Dunbar's Department of Corrections file, despite a request from Carriger that he do so. After remand, Carriger for the first time obtained Dunbar's corrections file through court-ordered discovery. The file contained evidence that Dunbar had long been known to state authorities as an habitual liar with a sociopathic personality, who had a lengthy history of burglaries, violence, and attempts at pinning his crimes on others. Counsel called a number of witnesses who testified to Dunbar's reputation as a liar. The trial court resentenced Carriger to death, and denied postconviction relief. R.T. 10/27/82 at 58, Supp. R.T. 10/27/82 at 14.
 
 
 10
 The Arizona Supreme Court affirmed, ruling that Carriger's claim of ineffective assistance was known to Carriger at the time of his appeal, should have been raised then, and had been waived. See State v. Carriger, 143 Ariz. 142, 692 P.2d 991, 995, 996 (1984) (Carriger III ). The court also rejected on the merits claims that Carriger was entitled to a lesser-included instruction under the rule of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), see Carriger III, 692 P.2d at 996-97, and that Arizona's death penalty was unconstitutional. See id. at 1008-11.
 
 D. 1985: First Federal Habeas
 
 11
 In 1985, Carriger filed his first federal petition for habeas corpus, presenting the claims exhausted in Carriger III. The district court granted Arizona's motion for summary judgment. Carriger filed a notice of appeal, but soon after requested that this court stay consideration of his appeal while he pursued a new state postconviction petition, based on newly discovered exculpatory evidence. See Carriger v. Lewis, 971 F.2d 329, 331 (9th Cir.1992) (en banc) (Carriger IV ) (superseding Carriger v. Lewis, 948 F.2d 588 (9th Cir.1991) (panel opinion)). We granted Carriger's motion and stayed his appeal.
 
 E. 1987 State Postconviction Proceedings
 
 12
 Carriger's second state postconviction petition was based on new information from Dunbar's family and friends indicating Dunbar had lied at trial regarding his whereabouts during the crime, had bragged of framing Carriger, and had instructed his family to lie to investigators and at trial.
 
 
 13
 By 1987, the judge who had presided at Carriger's trial had retired. At July and August hearings before a new judge, Joyce Stevens (Dunbar's wife at the time of the murder) and her children testified that Dunbar's alibi and Stevens' corroboration of it at trial were false. Stevens also testified that Dunbar left the house that afternoon and upon returning confessed the crime to her. Several witnesses, including a close friend of Dunbar's, testified that Dunbar had bragged of framing Carriger for the crime. Stevens and her children testified that Dunbar was an abusive person who had beaten them, had previously instructed them to lie, and had threatened their lives if they did not comply. Dunbar then took the stand and denied the allegations of abuse, and stated his trial testimony had been truthful. The evidentiary hearing was continued to permit counsel to investigate further evidence bearing on the credibility of the conflicting testimony given in the July and August hearings.
 
 
 14
 Not long after his testimony, Dunbar (through his own counsel) contacted Carriger's counsel. Dunbar, imprisoned on an unrelated conviction, was seriously ill. Dunbar said he believed he was dying, wanted to make his peace with God, and then confessed that he had robbed and murdered Robert Shaw, and had framed Carriger.
 
 
 15
 In October 1987, at the reconvened evidentiary hearing, Dunbar confessed under oath. He described the crime in great detail, and diagrammed the jewelry store, accurately depicting where Shaw's body was found. Dunbar testified that he and Stevens had committed the crime together, and that Stevens had struck the first blow to Mr. Shaw.
 
 
 16
 Three weeks after his sworn in-court confession, Dunbar wrote to the judge and recanted. Recalled to the stand in December 1987, Dunbar testified that his 1978 trial testimony had been truthful and his recent sworn confession a lie.
 
 
 17
 In February 1988, the trial court denied postconviction relief. The judge, who had not presided at trial and therefore could make no demeanor comparisons, rejected both Stevens' testimony and Dunbar's confession as incredible, principally because he thought them inconsistent with the trial evidence. The trial court also noted that Stevens recanted her trial testimony after being given immunity, and that Dunbar's confession was short-lived and motivated by claimed desires for money and revenge. State v. Carriger, No. CR 101609 (Ariz.Sup.Ct. Feb. 22, 1988). The Arizona Supreme Court affirmed without comment.
 
 
 18
 F. 1991-92: Second Federal Habeas Proceedings
 
 
 19
 Carriger then returned to federal court, and sought to raise his claims based on the 1987 state court testimony both in the district court and directly in this court. In a 1992 en banc opinion, we held that Carriger had not followed procedures adequate to give either this court or the district court jurisdiction to consider his new claims. See Carriger IV, 971 F.2d at 331. As a result of those jurisdictional rulings, the merits of Carriger's claims based on the 1987 evidence were not considered in the 1991-92 federal habeas proceedings, and, until now, have never been considered by this court.
 
 
 20
 In the 1992 en banc proceeding, we did finally reach the claims raised in Carriger's first habeas petition, i.e., the claims rejected by the Arizona Supreme Court in Carriger III. A divided en banc court rejected Carriger's ineffective assistance claim as procedurally barred, and rejected on the merits his claim of entitlement to a lesser-included instruction under Beck v. Alabama, and his challenge to the constitutionality of Arizona's death penalty statute. See Carriger IV, 971 F.2d at 333-36.
 
 
 21
 G. 1993: Third State Postconviction Petition
 
 
 22
 In 1993 Carriger, again represented by new counsel, filed a third state postconviction petition. His petition was based on new evidence that Dunbar had again confessed the crime, this time to a cellmate in 1991, shortly before Dunbar's death. Carriger also raised numerous other claims, including the claim that the State withheld exculpatory evidence. In 1994, the trial court denied relief. See State v. Carriger, No. CR 101609 (Ariz.Sup.Ct. Apr. 11, 1994). The Arizona Supreme Court affirmed without comment in July 1995.
 
 H. The Current Federal Habeas Proceedings
 
 23
 In August 1995, Carriger filed his current petition, in which he argues that all of the now-available evidence, including Dunbar's confession and the contents of Dunbar's corrections file, demonstrates that Dunbar committed the crime and that Carriger is actually innocent. Carriger also raises serious claims of constitutional violations at his trial, including a claim that the state suppressed the contents of the corrections file and that the government misled the jury when it told them Dunbar was not a liar. The district court rejected Carriger's claim of actual innocence, and held that his claim of withheld evidence could have been raised earlier, and therefore constituted an abuse of the writ. See Carriger v. Stewart, No. CIV-95-1617-PHX-PGR, Memorandum of Decision and Order at 10-19, 20-22, (D.Ariz. Nov. 2, 1995).
 
 
 24
 A panel of this court affirmed the district court's ruling that Carriger had failed either to show that he was actually innocent of the crime or to create a sufficient doubt about the accuracy of the verdict to permit consideration of his otherwise abusive claims. See Carriger v. Stewart, 95 F.3d 755, 758-61, 762-63 (9th Cir.1996) (Carriger V ). The panel expressed considerable doubt about the integrity of the jury's verdict in light of the present record, and suggested, but did not order, that the state reconsider its decision to execute Carriger. See id. at 761. We granted rehearing en banc. See Carriger v. Stewart, 106 F.3d 1415, 1416 (9th Cir.1997). We now vacate the panel opinion, and reverse the district court. We hold that Carriger is entitled to a new trial.
 
 II. Facts
 A. The Robbery and Murder
 
 25
 In December 1977, Paris Carriger was released from prison, and soon contacted Robert Dunbar, a prison acquaintance. Carriger acquired a van and some tools, and began doing construction work. When he needed a place to stay, Dunbar agreed that Carriger could park his van on Dunbar's property and live in it. On March 12, 1978, Carriger parked his van next to the house Dunbar shared with his wife, Joyce Stevens, and her children.
 
 
 26
 The next morning, March 13, Carriger called in sick at work. He then spent the day with Dunbar. The two visited a number of gun shops, and Dunbar eventually purchased a .22 caliber Luger pistol. Because it was illegal for Dunbar, a convicted felon, to purchase a gun, Dunbar lied on the federal gun purchase form, falsely claiming to have no felony convictions. Later in the day, the two visited Shaw's jewelry store, where Dunbar had his watch repaired. After leaving the store, one remarked to the other that the store would be an easy place to "hit." Dunbar testified at trial that Carriger made this remark, though Dunbar later testified in postconviction proceedings that he said it himself.
 
 
 27
 The men returned to Dunbar's house from Shaw's store between 3:00 and 3:30 p.m., and then went their separate ways. They met again at Dunbar's house between 5:30 and 6:30 that evening. In the interim, the robbery and murder were committed at Shaw's jewelry store.
 
 
 28
 In their later testimony, Dunbar and Carriger each accused the other of committing the crime. Carriger testified at his 1982 postconviction hearing that upon returning to Dunbar's house shortly after 3:00, Dunbar got into an argument with his wife, at which point Carriger left in his van and went to a nearby restaurant. Carriger testified he then went shopping for jeans, browsed briefly in an adult bookstore, and returned to Dunbar's house. Parking his van, he walked to a nearby convenience store and back, finally returning at about 6:00. Carriger testified that shortly after his return, as he sat in his van listening to the radio, Dunbar showed up. According to Carriger, Dunbar had a guilty look, and was holding a pair of Carriger's boots. Dunbar allegedly told Carriger that Carriger should replace the boots because they were "hot," suggesting Dunbar had worn them during the commission of a crime. Carriger testified that Dunbar then showed Carriger a bag containing a half dozen watches, and offered the watches to satisfy a debt Dunbar owed Carriger. Carriger refused the offer.
 
 
 29
 Dunbar, on the other hand, testified at trial that upon returning home sometime after 3:15, he retired for a nap with his wife. He said he was awakened sometime between 5:30 and 6:30 by Carriger, who summoned Dunbar outside. According to Dunbar, Carriger said he had robbed Shaw's jewelry store, and asked for Dunbar's help in getting rid of "this stuff." Dunbar said Carriger took Dunbar outside to his van, where he showed Dunbar an attache case containing jewelry and watches, and asked for Dunbar's help in removing the tags. Dunbar testified that together they removed the tags from the jewelry, and placed the tags in a paper bag. Dunbar also testified that Carriger described how he had tied up Shaw and killed him by beating him with a skillet and then choking him with his own necktie.
 
 
 30
 Dunbar's and Carriger's stories agree that after they rejoined at Dunbar's house, both knew that at least a robbery had been committed. Shortly afterward, Dunbar and Carriger went out together. Their first stop was the home of Jackie White, Dunbar's stepdaughter, who had recently moved out of Dunbar's house and who had a friendly relationship with Carriger. Carriger gave White two small cases, asking her to hold onto them. One of the cases turned out to be the case for the gun Dunbar had purchased that morning and contained only a gun cleaning kit, holster, and manual. The other case, an attache case, contained most of the stolen jewelry, the gun itself, and ammunition. The gun case and the cleaning kit inside it bore Carriger's fingerprints. The jewelry inside the attache case, however, bore only Dunbar's fingerprints, not Carriger's. The gun yielded no fingerprints.
 
 
 31
 Carriger and Dunbar then went to a massage parlor. While there, Dunbar produced a loose diamond taken from Shaw's and tried to sell it to a massage parlor employee. Dunbar and Carriger continued on to a shopping mall, where Dunbar again tried several times to sell pieces of the stolen jewelry that he had with him. While Dunbar showed the jewelry to a number of mall jewelers, Carriger bought new boots. The two then returned to Dunbar's house.
 
 B. Dunbar's Role in the Investigation
 
 32
 The following morning, Dunbar contacted detectives of the Phoenix Police Department and told them he had information regarding the murder and robbery. He also told them he had committed a recent (unrelated) burglary, and wanted immunity in exchange for his information and testimony. Detectives met Dunbar at a mall coffee shop, where Dunbar gave them pieces of jewelry taken during the robbery. He told the detectives that Carriger had committed the robbery and murder, and had asked for Dunbar's help in selling the stolen jewelry and getting rid of the evidence.
 
 
 33
 Dunbar told the detectives that Carriger might be armed with the handgun Dunbar had purchased the previous day, and that Dunbar considered Carriger to be extremely dangerous. Dunbar said that Carriger would kill police officers if he saw them approaching the residence. At the detectives' request, Dunbar called Carriger with a lie designed to get Carriger out of the house. Once Carriger left Dunbar's house, police pulled his van over and arrested him. Carriger was unarmed and did not resist arrest.
 
 
 34
 Dunbar also told the detectives he and Carriger had gone driving north of Phoenix the previous evening to dispose of the evidence. According to Dunbar, Carriger threw evidence out the window as Dunbar drove. After arranging the ruse leading to Carriger's arrest, Dunbar retraced his drive of the previous evening accompanied by a homicide detective, and led the detective to evidence discarded along the roadside, including a jacket, gloves, and boots allegedly worn by Carriger during the robbery, business cards from Shaw Jewelers, Robert Shaw's wallet and driver's license, and the cut-up pieces of Shaw's credit cards. Dunbar also directed police to the home of Ms. White, where they recovered the two cases Carriger had left the previous evening. Finally, Dunbar led police to a pair of jeans in the canal behind Dunbar's house, where he said Carriger had discarded them. The canal was nearly dry and the jeans were partially submerged in a shallow puddle. The jeans had a piece of one inside pocket cut out in a place where Carriger customarily marked his jeans with his name or initials.
 
 
 35
 One of the detectives who met Dunbar at the mall testified at trial that the detectives took the story Dunbar told them at face value. The same detective stated in a 1994 affidavit that one reason he took Dunbar's word was that he knew at the time that Dunbar was a longtime informant for the Phoenix Police burglary unit. That status was not made known to the defense or brought out at trial. Dunbar's history as an informant, as will be discussed, turned out to be somewhat less than reliable, and the detective who knew of Dunbar's informant status and took his story at face value in 1978 stated in his 1994 affidavit that he now believes Dunbar participated in Shaw's murder. Dunbar was never taken into custody, and neither his person nor his house was ever searched.
 
 C. The Evidence and Arguments at Trial
 
 36
 At trial, Dunbar, granted the immunity he requested, was the state's chief witness. He testified that he had been home asleep at the time of the robbery, and that Carriger had awakened him and confessed the crime. Dunbar's wife corroborated Dunbar's testimony that the two had been asleep together between 4:00 and 6:00 that afternoon.
 
 
 37
 In closing argument, the prosecutor vouched for Dunbar's credibility, stating repeatedly that Dunbar was not a liar. The prosecutor assured the jury that "[i]f there was any indication of his [Dunbar's] guilt or complicity in this, he would be on trial with him [Carriger]."
 
 
 38
 In addition to Dunbar's testimony and the physical evidence Dunbar had provided to the police, the state presented two additional pieces of physical evidence against Carriger. The first was a key to the attache case containing the stolen jewelry, which the arresting officer testified was found in Carriger's wallet when he was arrested. The second was a single fingerprint of Carriger's, which was found on the adhesive tape used to bind the wrists of the victim. The tape was the same type as Carriger kept in a first-aid kit in his van.
 
 
 39
 Because Carriger did not testify at trial, he offered no direct explanation of the key. Defense counsel did introduce evidence showing it was possible to plant a key in Carriger's prison property locker, and suggesting that the only keys in Carriger's possession when he was arrested were keys to his van and Dunbar's house. The defense explanation of the fingerprint was that the tape was Carriger's, and his fingerprint was already on the end of the roll when Dunbar took the tape from Carriger's van and used it to commit the crime.
 
 
 40
 D. Post-trial Discovery of Dunbar's Corrections File
 
 
 41
 As a result of court-ordered discovery in the 1982 state postconviction proceedings, Carriger's counsel for the first time obtained Dunbar's corrections file. The file revealed that Dunbar was well known by state authorities to be a liar. Using Dunbar's file, Carriger's 1982 postconviction counsel located prison superintendents, guards and fellow prisoners who testified that Dunbar was a pathological liar, with a reputation for manipulation and deceit well beyond even that expected in the generally dishonest prison environment.
 
 
 42
 Dunbar's file showed him to be a prolific career burglar, whose career included committing ninety-two burglaries in one sixmonth period. Most important, the file revealed a pattern of lying to police and shifting blame to others. After one commercial burglary, Dunbar falsely accused police officers of keeping money they recovered from him after his arrest. After another, Dunbar falsely accused the police of lifting his fingerprints from a water glass and then lying about it. Following a third commercial burglary, Dunbar claimed to have found the money lying in the street, and further claimed to have sought and received legal advice before deciding to keep it. Dunbar's pattern when caught lying was to seek a deal with the police as soon as possible. Following a 1976 burglary, Dunbar displayed behavior strikingly similar to his behavior following the 1978 Shaw robbery/murder: immediately after committing the burglary, Dunbar, on his own initiative, approached a police officer with a story to shift the blame for his burglary. Dunbar claimed that he had been robbed, and tried to paint the supposed robber as the one who committed the burglary.
 
 
 43
 Dunbar's corrections file revealed other facts inconsistent with Dunbar's trial testimony. Although Dunbar had testified that he was "not a robber" and had never used force, violence, or a gun in a burglary, his file contained admissions that he had committed armed robberies of savings and loans, that he had aided and abetted armed robberies of convenience stores, and that he had used a gun in at least one burglary. The file also contained a claim by Dunbar that he had been involved in a shootout with Phoenix police.
 
 
 44
 Finally, Dunbar's file revealed a long history of violence. Dunbar had been committed to the Arizona State Hospital because of violent rages and threats against his family, including an incident in which he wielded a knife against his parents, threatening to kill them. Dunbar was also dishonorably discharged from the Army for uncontrolled aggressive behavior and physical assaults. A presentence report in the corrections file noted that Dunbar had been found manipulative toward other people, and that he reacted violently when he didn't get what he wanted. Another report stated that Dunbar had been diagnosed as having a sociopathic personality.
 
 E. Dunbar's Confessions
 
 45
 In 1987, at an evidentiary hearing on Carriger's postconviction petition, Dunbar confessed under oath in open court that he had robbed Shaw's jewelry store and murdered Robert Shaw. He testified that he had committed the crime along with his wife, Joyce Stevens, and that he had framed Carriger to avoid prosecution. At the hearing, Dunbar described the crime in detail, including the layout of the store and the back room where Shaw's body was found. Dunbar accurately described the method of Shaw's death, and the position in which his body was left. He stated that his wife had first struck Shaw with the skillet, but that he then finished Shaw off with the skillet and the necktie. Dunbar stated that he and his wife had worn gloves during the crime, and that he had bound Shaw's wrists using adhesive tape from the first-aid kit in Carriger's van.
 
 
 46
 Dunbar testified that in the past he had often shifted the blame to others for his own crimes. He said that consistent with his past practice, his thoughts after committing the crime immediately turned to finding someone on whom to pin the blame. That someone, he testified, happened to be Carriger.
 
 
 47
 Dunbar also confessed the crime in a four-page letter to a woman with whom he corresponded through a prison ministry program. Dunbar's letter described the crime in sufficiently vivid detail that it frightened the ministry correspondent, who stopped her correspondence with Dunbar. The correspondent has declared in an affidavit that she reported the letter to the Arizona Attorney General's office, and was asked to forward the letter to them by mail, which she did. The Attorney General's office never stated whether it received the letter or knows of its whereabouts; the letter itself has never been produced.
 
 
 48
 Joyce Stevens testified at the 1987 postconviction hearing that Dunbar had confessed the crime to her. Several witnesses testified that after a 1981 television special on capital prisoners had included a profile of Carriger, Dunbar boasted that he had set Carriger up. Larry White, Joyce Stevens' oldest son, also testified that Dunbar once later described to him what it was like to see someone's head crushed with a skillet.
 
 
 49
 Shortly before his death in 1991, Dunbar again confessed, this time to his cellmate. He told the cellmate that he had killed Robert Shaw so that Shaw could not identify him, and that he had blamed Carriger to avoid taking the "fall."
 
 
 50
 F. Other Postconviction Evidence Implicating Dunbar
 
 
 51
 Joyce Stevens testified in 1987 that she had lied at trial when she corroborated Dunbar's alibi that he was napping with her at the time of the robbery. Stevens testified that Dunbar had a common practice of telling the children he was going to take a nap, and then slipping out of the house through a bedroom door leading outside, and committing burglaries while he was supposedly asleep. She stated that Dunbar did just that on the afternoon of March 13, 1978, leaving the house from the bedroom shortly after calling her into the bedroom to join him for a "nap." According to Stevens, Dunbar later told her he had committed the crime. Stevens explained that she had lied at trial out of fear of Dunbar, who had threatened her life and those of her children if she told the truth.[1]
 
 
 52
 Several of Stevens' children testified that Dunbar was an abusive and controlling figure, who regularly beat them and instructed them to lie to the prosecution concerning his involvement in this case. Stevens also testified that the day after the robbery, while she was doing the family laundry, she found the clothes Dunbar had worn the previous day, and that there was blood on the pants that she could not get out. She testified that when Dunbar saw the blood-stained pants drying on the porch, he became angry that Stevens had found them, and told her to leave his things alone. He took the pants, and she never saw them again.
 
 
 53
 Richard Fein, a close friend of Dunbar's, testified in July 1987 that Dunbar had told him several different times that his favored method of getting rid of evidence was to cut it up into pieces and then drive around the desert, disposing of it a little at a time, so it couldn't be connected up. Fein also testified that Dunbar described his technique for maintaining a consistent lie when he was shifting blame for his crimes to others.
 
 
 54
 Finally, both Stevens and her mother testified that Dunbar had often stated that he would never leave a witness to a crime he had committed.
 
 G. Dunbar's Recantation of His Confession
 
 55
 Dunbar recanted his October 1987 sworn confession in a letter to the judge three weeks later. Recalled to the stand, Dunbar claimed he had falsely confessed because he was angry at Stevens and her children for accusing him, and at the prosecutors and the state because of the length of the unrelated burglary sentence he was then serving and the particulars of his confinement. Dunbar also testified that his attorney was aware Dunbar's confession was false, and that the attorney had conspired with Dunbar to present a false story of a frame-up, in hopes of getting a book or movie deal and splitting the proceeds.
 
 
 56
 Dunbar claimed that the reason his confession testimony had been accurate and detailed was because Carriger's lawyer had shown him diagrams of the store and transcripts of trial testimony in prehearing meetings with Dunbar. Testimony from Carriger's and Dunbar's lawyers established that Dunbar had been shown no such diagrams or transcripts, and that Dunbar's counsel had had nothing to do with any scheme by Dunbar to testify falsely and profit from it.
 
 
 57
 Dunbar admitted at the December 1987 hearing that, given the inconsistency of his separate sworn stories, he had necessarily committed perjury in the Carriger case. He also stated that he had lied to prosecutors "in a lot of different cases and places." The trial court found Dunbar's confession was false and his 1978 trial testimony was truthful.
 
 
 58
 Dunbar died in 1991.
 
 
 59
 III. The District Court's Decision and Its Deference to the
 
 State Court's Credibility Determination
 
 60
 In his current petition, Carriger claims that he is actually innocent of the crime, and that his conviction and death sentence cannot stand because the state failed to disclose exculpatory evidence.[2] The district court denied relief, ruling that: (1) Carriger had not shown actual innocence sufficient either to bar his execution under Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), or to permit consideration of procedurally barred claims under Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); (2) Carriger's claim of withheld evidence could have been presented in his first federal habeas petition, and was therefore barred as an abuse of the writ; (3) Carriger had not shown cause or prejudice entitling him to consideration of the otherwise abusive claim, and (4) the claim of withheld evidence was in any event meritless.
 
 
 61
 Critical to the district court's conclusion that Carriger had not met the "miscarriage of justice" standard outlined in Schlup was the court's deference to the Arizona court's rejection of Dunbar's 1987 confession and Joyce Stevens' 1987 testimony implicating Dunbar. The district court noted that the Arizona court found both Dunbar's confession and Stevens' testimony incredible, and that witness credibility findings are factual determinations entitled to deference by federal courts if they are fairly supported by the record. See Carriger v. Stewart, No. CIV-95-1617-PHX-PGR, Memorandum of Decision and Order at 15-16 (D.Ariz. Nov. 2, 1995) (citing Marshall v. Lonberger, 459 U.S. 422, 432, 103 S.Ct. 843, 850-51, 74 L.Ed.2d 646 (1983)).
 
 
 62
 Dunbar's sworn confession is the most dramatic piece of evidence exonerating Carriger. Before reaching Carriger's claims, we consider first whether we may rely in any part on Dunbar's confession, or whether the district court correctly deferred to the state court's rejection of the confession.
 
 
 63
 We must defer to the state court's credibility finding unless the finding is not fairly supported by the record considered as a whole. See 28 U.S.C. § 2254(d)(8) (1994)[3]; Marshall v. Lonberger, 459 U.S. 422, 432-35, 103 S.Ct. 843, 849-51, 74 L.Ed.2d 646 (1983). The Arizona court's credibility determination, made in 1988 by a judge who had not been the trial judge, was based on the court's conclusions that the physical evidence at trial was consistent with Dunbar's trial testimony and inconsistent with his confession, and that Dunbar had motivations to lie in 1987.
 
 
 64
 With regard to the evidence at trial, the state court pointed specifically to "[Carriger]'s fingerprint on the tape binding the victim's hands, the attache case key found in Petitioner's property, the discarded clothes with the inside pockets removed where Carriger customarily placed his initials, Carriger's prints on the gun case, and the boots worn during the robbery which a number of witnesses in previous proceedings testified belonged to Petitioner." See State v. Carriger, No. CR 101609, slip op. at 5-6 (Ariz.Sup.Ct. Feb. 22, 1988).
 
 
 65
 Close examination of this evidence in the context of the entire course of proceedings, however, reveals that each piece of evidence is as consistent with Dunbar's confession as it is with his trial testimony. We look at each in turn:The fingerprint on the tape. Dunbar explained that he had taken the adhesive tape, used to bind Shaw's hands, from Carriger's van. The tape belonged to Carriger, and this would explain Carriger's fingerprint on the tape. Had Carriger left the print while binding the victim, as the state contends, it is difficult to understand how he could have left only one print. The State points to an offer of proof made at the 1987 hearing, in which a criminalist testified that he had reconstructed the tape and determined that Carriger's fingerprint was located some 21 inches from an end of the tape. This testimony suggests that the print was left during the binding of Shaw's hands.
 
 
 66
 Cross examination was able to bring out an internal inconsistency in the expert's testimony: the expert stated he could piece together all of the segments of tape cut from the victim's wrists by matching the irregularity of the edges, but admitted he could not match either end of the reconstructed tape to the end of the roll. The state court did not admit the criminalist's testimony into evidence, and made no findings as to its relationship. The defense never had an opportunity to examine the tape, in either reconstructed or unreconstructed form, or to have its own expert test the state's criminalist's conclusions. Although we may consider the offer of proof in our inquiry, we find no basis to conclude the criminalist's conclusions are reliable and therefore determine they should be accorded little weight.[4]
 
 
 67
 The attache case key. Dunbar testified that he gave Carriger the attache case to give to Jackie White to hold; he did not explain what he did with the key. He may have given Carriger the key as well.
 
 
 68
 Alternatively, Dunbar and Carriger may both have had keys to the case. The state court ignored the uncontradicted evidence that the fingerprints on the jewelry inside the case were Dunbar's, not Carriger's.
 
 
 69
 The discarded clothes. Dunbar testified in his confession that the clothes he led the police to were the clothes he, Dunbar, had worn during the robbery. Nothing establishes that the clothes had been worn by Carriger, rather than Dunbar. (Postconviction evidence established they fit both men.) Additionally, when he confessed, Dunbar stated he planted Carriger's jeans in the canal before leading police to them. No blood was found on the jeans, despite evidence at trial that blood would likely have spattered on the killer's pants. The canal was nearly dry at the time.
 
 
 70
 Carriger's fingerprints on the gun case. It is undisputed that Carriger and Dunbar were together when Dunbar bought the gun. There is no reason Carriger's prints would not have been on the gun case.
 
 
 71
 The discarded boots. Carriger does not dispute the boots were his. He testified in 1982 that Dunbar wore the boots during the crime. Postconviction testimony established that the boots fit Dunbar. In his confession, Dunbar testified that he discarded the clothes he wore during the crime, including the boots, and then, with the police along, re-collected them and said Carriger had worn them. The boots are no more consistent with Carriger's guilt than with Dunbar's.
 
 
 72
 Much of the other physical evidence at trial undercuts Dunbar's trial testimony, and supports Dunbar's guilt. First, it is significant that all of the stolen jewelry was in Dunbar's possession, not Carriger's. There was no connection between any of the stolen jewelry and Carriger, other than Carriger's having handed the attache case to Jackie White, and this Dunbar later testified he asked Carriger to do. To explain why the stolen jewelry in the attache case bore only his fingerprints, not Carriger's, Dunbar claimed that he and Carriger sat together in Carriger's van removing the tags. If Carriger did this without leaving fingerprints on the jewelry, while Dunbar did leave prints, Carriger must have worn gloves while Dunbar did not. Yet Dunbar said nothing at trial about Carriger wearing gloves to remove the tags, despite being questioned specifically about what Carriger was wearing while they removed the tags, and whether he had ever seen Carriger wear gloves. Moreover, if Carriger wore gloves, it is implausible that Dunbar would not have seen them and done the same.
 
 
 73
 There is other significant evidence supporting the credibility of Dunbar's confession that was not considered by either the state court or the district court. First, when he confessed to the crime in 1987, Dunbar was able to diagram Shaw's jewelry store in detail, including the location of the safe and the layout of the back room, and was able to depict accurately the location and position in which Shaw's body was found in the bathroom in back of the store. Dunbar could only have known those details if he had participated in the crime.
 
 
 74
 His knowledge was never adequately explained by any other evidence. According to Dunbar's trial testimony he had never been in the back of the store. Dunbar's December 1987 explanation that Carriger's counsel had shown him diagrams of the store and transcripts of trial testimony was shown to be false. Testimony from all others present at counsel's meetings with Dunbar established that Dunbar was lying and had been shown no diagrams or transcripts. (During his 1987 in-court confession, Dunbar also testified that he had never seen any diagrams, and that his recollection of the store interior was independent.) Dunbar's recollection of details only a participant in the crime could have known is strong evidence that his confession was truthful, and his trial testimony false.
 
 
 75
 Second, Dunbar's December 1987 recantation of his confession was itself rife with inconsistencies and false statements. In addition to lying about having been shown diagrams and transcripts, Dunbar claimed that his lawyer had conspired with him to sell a false frameup story and split the book and movie proceeds. Testimony from Dunbar's lawyer, as well as inconsistencies in Dunbar's story, established that Dunbar's lawyer had had nothing to do with any such plan, and that selling the story had been Dunbar's idea. When asked to explain inconsistencies in his story, Dunbar was vague and evasive, twice resorting to claims of recent mental problems.
 
 
 76
 Finally, when he confessed the Shaw murder in October 1987, Dunbar testified with no immunity of any kind. He acknowledged on the stand that by confessing, he was opening himself to prosecution for capital murder and a possible sentence of death. By contrast, both at trial and when he recanted his confession in December 1987, Dunbar testified with a grant of testimonial immunity. Asked in December 1987 why he had decided to retract his confession, Dunbar replied, "I don't believe I recall the exact reason other than I don't really want to be prosecuted for murder. I don't want to go on death row." Dunbar's admission that he recanted to avoid prosecution makes the recantation highly suspect, while the fact that he confessed without immunity and overwhelmingly against his own penal interest is a strong indicator of reliability. See Williamson v. United States, 512 U.S. 594, 599, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994) (discussing Fed.R.Evid. 804(b)(3)); accord 5 Wigmore on Evidence, §§ 1457, 1477 (Chadbourn rev.1974).
 
 
 77
 It is true that Dunbar did not stand by his confession very long, and that Dunbar's anger at Stevens and at the prosecution gave him some motivation to lie in 1987. There is virtually no other support for the state court's rejection of Dunbar's confession. Much of the physical evidence, Dunbar's history, and the testimony of other witnesses cuts against it. The entire record, viewed as a whole, does not fairly support the state court's determination that Dunbar was more credible at trial. On the contrary, the record strongly suggests that Dunbar's post-trial confession was more reliable than either his trial testimony or his December 1987 recantation. Under 28 U.S.C. § 2254(d)(8), because the state court's credibility determination is not fairly supported by the record as a whole, it is not entitled to a presumption of correctness. We therefore consider Dunbar's confession as at least some evidence supporting Carriger's claims.
 
 
 78
 IV. Carriger's Freestanding Claim of Actual Innocence:
 
 Herrera v. Collins
 
 79
 Carriger's first contention in his petition and on appeal is that all of the evidence now available establishes that he is actually innocent of the Shaw robbery and murder. Carriger argues that the evidence sufficiently establishes his innocence to render his execution unconstitutional, irrespective of any constitutional error at his trial or sentencing. This is a "freestanding" actual innocence claim like that discussed in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), where a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution. A different majority of the Justices would have explicitly so held. Compare id. at 417, 113 S.Ct. at 869 (majority opinion) with id. at 419, 113 S.Ct. at 870 (O'Connor, J., joined by Kennedy, J., concurring) and id. at 430-37, 113 S.Ct. at 876-79 (Blackmun, J., joined by JJ. Stevens and Souter, dissenting).
 
 
 80
 In Herrera, the Supreme Court did not specify what showing would be required for a habeas petitioner to make out a successful freestanding claim of actual innocence. The Court stated only that the threshold would be "extraordinarily high," and that the showing would have to be "truly persuasive." Herrera, 506 U.S. at 417, 113 S.Ct. at 869; accord id. at 426, 113 S.Ct. at 874 (O'Connor, J., concurring). The Court found it unnecessary to be more specific, because Herrera's showing was unconvincing under any standard. See id. at 417-19, 113 S.Ct. at 869-70; accord id. at 424-27, 113 S.Ct. at 873-74 (O'Connor, J., concurring).
 
 
 81
 In this appeal, Carriger argues that he is entitled to relief because "no rational finder of fact could convict beyond a reasonable doubt in light of all the presently available evidence." Carriger thus urges us to adopt the standard discussed in Justice White's concurring opinion in Herrera. Justice White, assuming with the majority that a freestanding claim of innocence could entitle a habeas petitioner to relief, stated that the required showing would have to be, at the bare minimum, the same as that required to invalidate a conviction because of insufficient evidence under Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979), taking into account all the evidence, including both the newly proffered evidence and the evidence at trial. See Herrera, 506 U.S. at 429, 113 S.Ct. at 875 (White, J., concurring in the judgment). Justice White, however, addressed only the minimum required showing; he did not find it necessary to decide finally what the threshold would be. See id. Moreover, Justice White did not speak for a majority.
 
 
 82
 We conclude that the Herrera majority's statement that the threshold for a freestanding claim of innocence would have to be "extraordinarily high," id. at 417, 113 S.Ct. at 869; accord id. at 426, 113 S.Ct. at 874 (O'Connor, J., concurring), contemplates a stronger showing than insufficiency of the evidence to convict. We therefore decline to adopt the modified Jackson standard. We believe that the required showing would have to be at least as high as the more demanding standard articulated by Justice Blackmun in his Herrera dissent. Justice Blackmun stated that to be entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent. See Herrera, 506 U.S. at 442-44, 113 S.Ct. at 882-83 (Blackmun, J., dissenting).
 
 
 83
 Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. As Justice Blackmun explained,
 
 
 84
 conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.
 
 
 85
 Herrera, 506 U.S. at 443, 113 S.Ct. at 882-83 (Blackmun, J., dissenting); accord id. at 399-400 & 407 n. 6, 113 S.Ct. at 860 & 864 n. 6 (majority opinion) (noting that a valid conviction strips petitioner of the presumption of innocence and attaches a presumption of guilt). In light of the presumption of guilt that attaches after a constitutionally valid conviction, "it is fair to place on [a petitioner asserting a Herrera claim] the burden of proving his innocence, not just raising doubt about his guilt." Id. at 443, 113 S.Ct. at 883 (Blackmun, J., dissenting).
 
 
 86
 Carriger has not met this burden. Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence. Carriger has presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor is there any new and reliable physical evidence, such as DNA, that would preclude any possibility of Carriger's guilt. Although Dunbar's confession exonerating Carriger does constitute some evidence tending affirmatively to show Carriger's innocence, we cannot completely ignore the contradictions in Dunbar's stories and his history of lying. Accordingly, the confession by itself falls short of affirmatively proving that Carriger more likely than not is innocent. Carriger's freestanding claim of actual innocence must fail.
 
 
 87
 V. The "Miscarriage of Justice" Gateway: Schlup v. Delo
 
 
 88
 Unlike the petitioner in Herrera, Carriger accompanies his claim of actual innocence with substantial claims of constitutional violations at trial. The constitutional claims Carriger raises could have been raised in his first federal habeas petition in 1985, and therefore would ordinarily be barred under the abuse of the writ doctrine. See McCleskey v. Zant, 499 U.S. 467, 490, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991). Carriger may have his otherwise-barred claims considered on the merits, however, if his claim of actual innocence is sufficient to bring him within the "narrow class of cases ... implicating a fundamental miscarriage of justice." Schlup v. Delo, 513 U.S. 298, 315, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995) (quoting McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470).
 
 
 89
 The terminology in this area is sometimes confusing, because the "miscarriage of justice" exception, like the freestanding claim in Herrera, has been described as a showing of "actual innocence." See Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (requiring petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent"). But unlike a Herrera claim, the "miscarriage of justice" exception is not an independent avenue to relief. Rather, if established, it functions as a "gateway," permitting a habeas petitioner to have considered on the merits claims of constitutional error that would otherwise be procedurally barred. See Schlup, 513 U.S. at 315-16, 115 S.Ct. at 861; Herrera, 506 U.S. at 404, 113 S.Ct. at 862.
 
 
 90
 In Schlup, the Supreme Court explained that the threshold for making out the "miscarriage of justice" exception is lower than the "extraordinarily high" threshold for freestanding (Herrera ) claims of innocence, for two reasons. First, the "miscarriage of justice" exception does not itself provide an independent basis for relief. The basis for relief is the claimed underlying constitutional violations. More important, because a petitioner claiming he falls within the miscarriage of justice exception asserts constitutional error at trial, his conviction is not entitled to the same degree of respect as one concededly free of constitutional taint. See Schlup, 513 U.S. at 316, 115 S.Ct. at 861. Accordingly, a petitioner asserting both innocence and constitutional error "need carry less of a burden" with respect to innocence than a petitioner like Herrera who claimed only innocence. See id. While a petitioner making a Herrera claim must present evidence of innocence so strong that his execution would be " 'constitutionally intolerable' even if his conviction was the product of a fair trial," a petitioner making a miscarriage of justice claim need only present evidence of innocence strong enough "that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Id. (second emphasis added). In the latter case, "the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." Id.
 
 
 91
 The Court in Schlup went on to precisely articulate the showing a petitioner must make to pass through the gateway. The Court held that to permit consideration of his procedurally barred claims, a petitioner must show that in light of all the evidence, including new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, at 327, 115 S.Ct. at 867. The Court emphasized that in considering all the available evidence, the court is not bound by the rules of admissibility, but must consider "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Id. (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).
 
 
 92
 The dissent incorrectly assumes that in order to prevail on a Schlup claim, Carriger must prove that he is actually innocent. As the Court wrote in Schlup, "[Schlup's] constitutional claims are based not on his innocence, but rather on his contention that ... the withholding of evidence [citation omitted], denied him the full panoply of protections afforded to criminal defendants by the Constitution." Schlup v. Delo, 513 U.S. 298, 314, 115 S.Ct. 851, 860, 130 L.Ed.2d 808 (1995). Therefore, the petitioner is required to present "evidence of innocence" such that "a court cannot have confidence in the outcome of the trial." Id. at 316, 115 S.Ct. at 861. In other words, the claim is procedural, not substantive as the dissent suggests. See id. at 312-14, 115 S.Ct. at 860 ("Schlup's claim of innocence ... is procedural, rather than substantive."). The Schlup Court contrasted this showing with that required under a Herrera claim in which the court must find that the "new facts unquestionably establish Schlup's innocence." Id. at 316, 115 S.Ct. at 862.
 
 
 93
 Although Carriger has not affirmatively proved his actual innocence sufficiently to satisfy Herrera, we believe he has more than shown sufficient doubt about the validity of his conviction to satisfy Schlup and permit consideration of his constitutional claims. It is more likely than not that no reasonable juror hearing all of the now-available evidence would vote to convict Carriger beyond a reasonable doubt. See Schlup, at 326-30, 115 S.Ct. at 867-68.
 
 
 94
 Considering Dunbar's confession along with the other evidence, which points as directly to Dunbar as to Carriger, we conclude that Carriger has met the Schlup standard. It is unlikely that any reasonable juror, knowing that Dunbar, without immunity, confessed under oath to committing the murder, would nonetheless conclude beyond a reasonable doubt that the murder was committed by Carriger. We are even more certain that no reasonable juror would vote to convict Carriger beyond a reasonable doubt, if such a juror knew:
 
 
 95
 -- that Dunbar, in his sworn confession, accurately described details about the crime and the crime scene that only a participant could have known;
 
 
 96
 -- that Dunbar's confession explained why Carriger's fingerprint was on the tape, although Carriger was not there;
 
 
 97
 -- that Dunbar had boasted in front of friends and family members that he set Carriger up;
 
 
 98
 -- that Dunbar had described to a close friend how he liked to dispose of evidence by cutting it up and discarding it bits at a time while driving around the desert, as was done in this case;-- that Dunbar had described to the same friend his technique for consistently maintaining a lie when blaming a crime on someone else;
 
 
 99
 -- that Dunbar had told Stevens' oldest son how gruesome it was to see someone's head crushed with a skillet; and
 
 
 100
 -- that Dunbar had a long history, known to state authorities, of violence, lying to police, and trying to pin his crimes on others.
 
 
 101
 Because Carriger has satisfied the Schlup gateway standard, we may consider the merits of his otherwise-abusive claims of constitutional error at trial. We therefore turn to the dispositive constitutional claim.
 
 
 102
 VI. Carriger's Claim of Constitutional Error at Trial:
 
 Brady v. Maryland; Giglio v. United States
 
 103
 Carriger's strongest claim of constitutional error at trial is that the state withheld Dunbar's Department of Corrections file, which would have revealed Dunbar's long history of lying to police and blaming his crimes on others. Carriger argues the state was obligated, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to disclose to the defense this critical information bearing on Dunbar's credibility.
 
 
 104
 The prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request. See Kyles v. Whitley, 514 U.S. 419, 432-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Evidence is material, and must be disclosed, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, at 433, 115 S.Ct. at 1565; Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. A "reasonable probability" does not require showing by a preponderance that the outcome would have been different. See Kyles, at 433-35, 115 S.Ct. at 1565-66. Rather, a " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
 
 
 105
 Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses. See Bagley, 473 U.S. at 676, 105 S.Ct. at 3380; Giglio, 405 U.S. at 154-55, 92 S.Ct. at 766. The need for disclosure is particularly acute where the government presents witnesses who have been granted immunity from prosecution in exchange for their testimony. We have previously recognized that criminals who are rewarded by the government for their testimony are inherently untrustworthy, and their use triggers an obligation to disclose material information to protect the defendant from being the victim of a perfidious bargain between the state and its witness. We said that informants granted immunity are
 
 
 106
 [b]y definition ... cut from untrustworthy cloth[,] and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom.... Because the government decides whether and when to use such witnesses, and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy.... Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by Giglio to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility.
 
 
 107
 United States v. Bernal-Obeso, 989 F.2d 331, 333-34 (9th Cir.1993).
 
 
 108
 The record is not conclusive as to whether the individual prosecutors in this case ever actually possessed Dunbar's corrections file. The prosecutor's actual awareness (or lack thereof) of exculpatory evidence in the government's hands, however, is not determinative of the prosecution's disclosure obligations. See Kyles, at 435-40, 115 S.Ct. at 1567-68. Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. See id., 436-38, 115 S.Ct. at 1567. Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned. See id., at 438-40, 115 S.Ct. at 1568. The disclosure obligation exists, after all, not to police the good faith of prosecutors, but to ensure the accuracy and fairness of trials by requiring the adversarial testing of all available evidence bearing on guilt or innocence. See id., at 438-42, 115 S.Ct. at 1568-69; Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97.
 
 
 109
 In this case, Dunbar was the prosecution's star witness, and was known by police and prosecutors to be a career burglar and six-time felon, with a criminal record going back to adolescence. When the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility. See Giglio, 405 U.S. at 154, 92 S.Ct. at 765; Bernal-Obeso, 989 F.2d at 333-34. This must include the witness's criminal record, including prison records, and any information therein which bears on credibility. The state had an obligation, before putting Dunbar on the stand, to obtain and review Dunbar's corrections file, and to treat its contents in accordance with the requirements of Brady and Giglio.
 
 
 110
 To the extent defense counsel's failure to request the file was a cause of the state's failure to disclose it, that failure constituted clear ineffective assistance of counsel. Either way, Carriger was denied a fair trial. We do not independently consider the ineffective assistance of counsel issue because the Supreme Court has clarified that the state's Brady obligations do not depend upon the defense's discovery requests. See Kyles, at 432-34, 115 S.Ct. at 1565; Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
 
 
 111
 The question thus becomes whether the file's contents are "material," i.e., whether there is a reasonable probability that disclosure of the file would have led to a different result at trial. See Kyles, at 432-34, 115 S.Ct. at 1565. In deciding whether the withheld evidence satisfies this standard, we evaluate its effect cumulatively, not item-by-item. See id., at 436-38, 115 S.Ct. at 1567.
 
 
 112
 The contents of the Dunbar file must be deemed to be material. Dunbar's credibility was critical. As Justice Feldman of the Arizona Supreme Court explained in 1984,
 
 
 113
 Dunbar was the state's only direct witness.... There was no direct evidence of Carriger's guilt. The case was tried, therefore, on a simple basic issue: Did Dunbar tell the truth when he blamed the robbery and murder on Carriger, or was Carriger's contention that the robbery and murder were committed by Dunbar to be believed? All other issues were peripheral.
 
 
 114
 Carriger III, 692 P.2d at 1012 (Feldman, J., dissenting).
 
 
 115
 At trial the prosecution, while acknowledging Dunbar to be a career burglar and convicted felon, nonetheless painted him as a nonviolent and truthful man. Dunbar testified, unrebutted, that he was not capable of murder, that he was not a robber, and that he had never used force, violence, or a gun in any burglary. Most important, the prosecutor argued at length in closing that Dunbar was not a liar ("He is a burglar, he is a crook.... He is a lot of things but he is not a liar."). Further vouching for Dunbar's credibility, the prosecutor assured the jury that "[i]f there was any indication of his [Dunbar's] guilt or complicity in this, he would be on trial with him [Carriger]."
 
 
 116
 While the above picture was painted at trial, the undisclosed information in the state's files showed:
 
 
 117
 -- that Dunbar had been committed to the Arizona state hospital because of violent rages and threats against his family;
 
 
 118
 -- that Dunbar had brandished a knife at his parents and threatened to kill them;
 
 
 119
 -- that Dunbar was dishonorably discharged from the Army for uncontrolled aggressive and physically assaultive behavior;
 
 
 120
 -- that Dunbar had in the past falsely accused police officers of keeping money they recovered from him after arresting him for burglary;
 
 
 121
 -- that Dunbar had falsely denied a burglary and falsely accused the police of lifting his fingerprints from a water glass and lying about it;
 
 
 122
 -- that Dunbar admitted he had been involved in a shootout with a Phoenix policeman;
 
 
 123
 -- that Dunbar had stated he had committed armed robberies of savings and loans in Phoenix and California;
 
 
 124
 -- that Dunbar had also denied ever being involved in bank robberies;
 
 
 125
 -- that Dunbar had been found by authorities to be manipulative toward other people, and that he reacted violently when he didn't get what he wanted;
 
 
 126
 -- that a psychiatrist had diagnosed Dunbar as having a "sociopathic personality";
 
 
 127
 -- that Dunbar had aided two armed robberies of convenience stores, and admitted conspiracy in those robberies;
 
 
 128
 -- that Dunbar had used a gun in at least one burglary; and
 
 
 129
 -- that after committing a 1976 commercial burglary, Dunbar had immediately approached police on his own initiative and attempted to blame the burglary on another.
 
 
 130
 The defense never received, and the jury never heard, any of this information. In addition, the jury did not know that the state's files showed Dunbar committed ninety-two admitted burglaries in the six months following his release from his first burglary sentence. Had this evidence of Dunbar's prolificacy in his profession been known, the defense could have used it to question the thoroughness or good faith of an investigation that did not include Dunbar as a suspect. See Kyles, at 444-48, 115 S.Ct. at 1571-72.
 
 
 131
 The evidence revealed in Dunbar's file need not have been independently admissible to have been material. Evidence is material if it might have been used to impeach a government witness, because "if disclosed and used effectively, it may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676, 105 S.Ct. at 3380; accord Giglio, 405 U.S. at 154, 92 S.Ct. at 766; Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence ...."); see also Kyles, at 444-52, 115 S.Ct. at 1571-74 (discussing impeaching uses of undisclosed evidence). As we have observed, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination." Bernal-Obeso, 989 F.2d at 335. It is for precisely that reason that we require "that relevant evidence bearing on the credibility of an informant-witness be timely revealed" to the defense. Id.
 
 
 132
 The district court erred when it concluded that Carriger had not been prejudiced by the withholding of the information because the jury already knew Dunbar was a burglar testifying with immunity. The telling evidence that remained undisclosed included the length of Dunbar's record of burglaries, and, more important, his long history of lying to the police and blaming others to cover up his own guilt.
 
 
 133
 The district court also noted that the jury had already heard "a wealth of negative information about Dunbar's veracity." However, the only evidence before the jury that Dunbar had lied was his admission that he had falsified the gun registration form. There was no evidence concerning his long history of falsely blaming others for his misdeeds. Furthermore, although the jury heard Dunbar admit he had once slapped his stepdaughter, they heard no evidence of Dunbar's lifelong history of violence. The latter evidence, had it been disclosed, would have been relevant to Carriger's defense that Dunbar did it, and to the related issues of the quality of the investigation, and the decision not to charge Dunbar.
 
 
 134
 We have held that the government cannot satisfy its Brady obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. See Bernal-Obeso, 989 F.2d at 335. Rather, the government is obligated to disclose "all material information casting a shadow on a government witness's credibility." Id. at 334 (emphasis in original).
 
 
 135
 In this particular case the state's claim that the undisclosed information made no difference is severely undercut by the prosecutor's strenuous vouching for Dunbar's truthfulness in closing argument. The prosecutor acknowledged that the whole case came down to whether Dunbar was telling the truth, or whether, as Carriger contended, Dunbar did it and framed Carriger. R.T. 7/25/78 at 464. Knowing Dunbar's credibility was the key to the case, the prosecutor emphasized to the jury that even though Dunbar was a career burglar, he was a truthful man:
 
 
 136
 [H]e is a smart cookie, he is a burglar, he is a crook. He is not a liar. Remember when the probation officer was on the stand. Did you ever catch him in a lie-never. Ever catch him in a lie-no.... What I am trying to put across, I don't want you [the jury] to get in the position of falling to that kind of logic, letting a murderer go because he is taking pot shots at our star witness. That is the important thing to remember. If there was any indication of his [Dunbar's] guilt or complicity in this, he would be on trial with him.
 
 
 137
 Remember, I asked him on the stand, what did I tell you is going to happen to you if you tell a lie, what did I tell you is going to happen to you, what is the penalty for lying in a perjury case? He knew right away, ladies and gentlemen, he did not lie to you. He is a lot of things but he is not a liar.
 
 
 138
 Id. at 463-64. Entirely apart from being itself improper conduct, see United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985); Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the prosecutor's vouching underscores the centrality of Dunbar's credibility.
 
 
 139
 We conclude that there is more than a reasonable probability that the outcome of Carriger's trial would have been different had Dunbar's records been disclosed. The result was a verdict not worthy of confidence and a trial that denied Carriger due process of law. Carriger is entitled to a new trial.
 
 
 140
 The panel opinion, 95 F.3d 755, is VACATED.
 
 
 141
 The district court's judgment is REVERSED AND REMANDED WITH INSTRUCTIONS TO GRANT THE WRIT OF HABEAS CORPUS.
 
 
 142
 KOZINSKI, Circuit Judge, with whom Judges FARRIS, FERNANDEZ, T.G. NELSON and KLEINFELD join, dissenting.
 
 
 143
 What makes this a tough case is that Robert Dunbar, the prosecution's key witness, turns out to have been a big liar. Had the jurors seen Dunbar as we now see him, they would not have believed a thing he said. It is therefore surprising that my colleagues in the majority are able to say with confidence that one of Dunbar's many stories accurately describes what happened the day Robert Shaw was killed. And yet, it is this finding-that Dunbar told the truth when he said that he and his wife killed Shaw-which unlocks the Schlup gateway through which Carriger must pass before we can consider his abusive Brady claim.
 
 
 144
 Dunbar's fairy tale is not the stuff of which Schlup claims are made. The Supreme Court recognized in Schlup that "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To make out such a claim, a petitioner must come forward with reliable new evidence of his innocence. A repudiated recantation can never be reliable enough to satisfy Schlup. But even if it could under ideal circumstances, it cannot here because the majority's new evidence, even if believed, proves merely that Dunbar was guilty of Shaw's murder right along with Carriger. Only the innocent can profit from Schlup, and the new evidence here leaves Carriger at the murder scene with blood on his hands. Because the majority widens the Schlup gateway far beyond what the Supreme Court envisioned, I must respectfully dissent.I
 
 
 145
 Schlup is a narrow exception to the rule that we will not consider abusive habeas claims; its limited purpose is to protect against "the execution of a person who is entirely innocent." 513 U.S. at 324-25, 115 S.Ct. at 866 (emphasis added). As a matter of necessity and design, we normally rely on a state's trial, appellate and collateral review processes to determine the truth in criminal prosecutions. Federal habeas provides another layer of protection, albeit limited. In capital cases, Schlup provides a further layer, more limited still. Only where a petitioner makes a compelling case based on reliable, credible, concrete proof that he is actually innocent may a federal court cast aside orderly procedure and consider an otherwise defaulted habeas claim.
 
 
 146
 Schlup started by recognizing that the vast majority of innocence claims are not credible: "[C]hallenges to the propriety of imposing a sentence of death are routinely asserted in capital cases...." Id. at 324, 115 S.Ct. at 865. Because unreliable evidence of innocence is easy to come by, the district court should quickly dismiss claims based on such evidence. Id. Truly credible claims are far less common: "[E]xperience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." Id. Only when a petitioner comes up with reliable, concrete, verifiable proof of actual innocence do we subordinate principles of finality and comity by considering a procedurally defaulted claim. Id.
 
 
 147
 Writing for the Court in Schlup, Justice Stevens explained that "[t]o be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial." Id. at 324, 115 S.Ct. at 865. Requiring that new evidence be reliable draws a workable line between the many cases involving frivolous claims of innocence and the few that raise potentially meritorious claims. See Weeks v. Bowersox, 119 F.3d 1342, 1351 (8th Cir.1997) (en banc); Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir.1996). Schlup offered three examples of evidence that would pass the threshold of reliability: exculpatory scientific evidence, trustworthy eyewitness accounts and critical physical evidence. Schlup, 513 U.S. at 324, 115 S.Ct. at 865-66. By enumerating the kinds of proof that could form the basis of a substantial claim of innocence, the Supreme Court was telling us that less reliable kinds of evidence cannot support an actual innocence claim. The Court clearly did not hold that Schlup may be invoked whenever a witness changes his story.
 
 
 148
 Carriger's new evidence is not exculpatory scientific evidence, and it is not critical physical evidence. Is it a "trustworthy eyewitness account"? Certainly not. Recanting testimony has long been disfavored as the basis for a claim of innocence. Appellate courts, even on direct review, look upon recantations with extreme suspicion. See United States v. Pointer, 17 F.3d 1070, 1074 (7th Cir.1994); Olson v. United States, 989 F.2d 229, 231 (7th Cir.1993); United States v. Nixon, 881 F.2d 1305, 1311 (5th Cir.1989); United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir.1988); United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir.1987); United States v. Adi, 759 F.2d 404, 408 (5th Cir.1985).[1] Recanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial. A repudiated recantation like Dunbar's is even less worthy of serious consideration. One respected commentator advises that a motion for a new trial based on a repudiated recantation usually isn't worth the time it takes to prepare: "Although [a repudiation] does suggest that the witness is 'completely irresponsible,' the motion appears to have little or no chance of success. With the repudiation of the recantation, it becomes merely impeaching and could be used at a new trial only for the purpose of cross-examining the witness, and not as substantive evidence." Moore's Federal Practice § 633.05 (3d ed.1997).
 
 
 149
 The majority tries to add force to Dunbar's recantation with the high drama of a death bed confession, the mea culpa of a guilt-ridden man clearing his conscience before going to meet his Maker.[2] See maj. op. at 467. Quite moving, were it but true. Dunbar long outlived his confession: He recanted the confession shortly after he made it, but didn't die until four years later. Dunbar's recantation was nothing but a spiteful counterpunch to his estranged wife's accusation. In post-conviction proceedings nine years after the murder, the defense had called Joyce Stevens, Dunbar's ex-wife, who had provided Dunbar's "nap" alibi at trial. Joyce's new story was that Dunbar had confessed he was at the jewelry store with Carriger, and that Dunbar had actually struck the fatal blows with the skillet.[3] When Dunbar took the stand a few weeks later, he parried Joyce's story by testifying that she robbed the place with him and struck the first blows with the frying pan. Tit for tat.
 
 
 150
 The majority makes much of the fact that Dunbar confessed in "open court." See maj. op. at 465 ("Dunbar actually confessed in open court"); id. at 465 ("Dunbar confessed under oath in open court"). But Dunbar also testified at trial in open court, and then repudiated his confession in open court six weeks after he had made it. We thus know for sure that Dunbar lied in court at least once, probably many more times. See id. at 481. The majority makes Dunbar out to be a congenital liar, see id. at 480-482 then treats one of his statements as the Gospel Truth.
 
 
 151
 As in many cases, recanting testimony is all too common here: Joyce recanted her trial testimony, her children recanted theirs, Dunbar recanted his, and then he recanted his recantation. It's not easy to pluck the truth from this thistle of lies. The majority credits both Joyce's and Dunbar's recantations, but the two stories contradict each other on the key fact of whether Carriger was there. Far from corroborating Dunbar's confession, Joyce's testimony yanks the rug out from under the one fact that matters. To unlock the Schlup gateway for Carriger, we must find that Dunbar's recanted confession-not his testimony at trial, not his retraction, not Joyce's testimony at trial or her retraction-accurately describes what happened. A confession shrouded by so much doubt from a witness who is now dead is not reliable enough to satisfy Schlup. If what we have here is enough, the Schlup gateway becomes a freeway off death row. The doctrine of abuse of the writ, see McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454, 1469-70, 113 L.Ed.2d 517 (1991), will be severely undermined.
 
 II
 
 152
 The Schlup framework protects only those who are "entirely" innocent, not those who are guilty of homicide but ineligible for the death penalty. Under Schlup, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). This compact phrase formulates a daunting standard: We must imagine twelve reasonable jurors hearing the original case against the petitioner, as augmented by the new evidence. For a petitioner to pass through the Schlup gateway, he must persuade us that every imaginary juror, twelve out of twelve, would vote to acquit him of any involvement in the killing.[4]
 
 
 153
 In a short paragraph buried in the bowels of its opinion, the majority dismisses the notion that "Carriger must prove that he is actually innocent." Maj. op. at 478. According to the majority, under Schlup "the petitioner is required to present 'evidence of innocence' such that 'a court cannot have confidence in the outcome of the trial.' " Id. The majority cuts the heart out of Schlup by omitting its key requirement, namely that "a petitioner show that he is 'actually innocent.' " Schlup, 513 U.S. at 327, 115 S.Ct. at 867. The showing of innocence under Schlup /Carrier is somewhat lower than that under Herrera /Sawyer,[5] but the need for a petitioner to prove his innocence is echoed repeatedly in Schlup: "Carrier requires a petitioner to show that he is 'actually innocent.' " Schlup, 513 U.S. at 327, 115 S.Ct. at 867; id. at 326-27, 115 S.Ct. at 867 ("[W]e hold that the Carrier "probably resulted" standard ... must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims."); id. at 327, 115 S.Ct. at 867 ("The Carrier standard requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent."); id. at 327, 115 S.Ct. at 867 ("The Carrier standard is intended to focus the inquiry on actual innocence."); id. at 327, 115 S.Ct. at 867 ("[T]he Carrier standard requires a petitioner to show that it is more likely than not that 'no reasonable juror' would have convicted him.").[6]
 
 
 154
 The majority's disregard of Schlup shows up in another stealth reference, this time in the bottom half of a footnote: "We do not agree with the assumption that ... our test under Schlup is to decide how a hypothetical jury would regard each bit of new evidence. Our task is to determine whether confidence in the actual verdict is undermined." Maj. op. at 474 n. 4. Are we all reading the same Supreme Court opinion? In my version, the Court holds that "a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329, 115 S.Ct. at 868 (emphasis added).[7] The Supreme Court expects us to consider the state of the evidence now-adding both the exculpatory and the inculpatory proof that has come to light since the verdict-and determine whether a properly instructed jury would find the defendant innocent. Predicting what reasonable jurors would do is not easy.[8] It's much harder than combing the record and picking at the state's case. But it's what Schlup demands.
 
 III
 
 155
 Carriger has failed to prove that, "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329, 115 S.Ct. at 868. Even if Dunbar's repudiated confession were the type of evidence that could trigger a Schlup inquiry, we would then have to determine whether Carriger is entirely innocent of Shaw's killing. Proof that others are also guilty, or that Carriger's role was less central than the original jury may have believed, is not enough. To pass through the Schlup gateway, Carriger must do more than raise doubt in the mind of some imaginary juror. He must identify new evidence which so undermines the state's case that each and every reasonable juror would vote to acquit.
 
 
 156
 Measured against this standard, there is precious little here that helps Carriger. Let's start with Dunbar's confession, which the majority seems so taken with. Because Shaw was killed in the course of a robbery, Carriger would be guilty of felony murder even if he did not kill Shaw himself. See State v. Vargas, 127 Ariz. 59, 618 P.2d 229, 230 (Ariz.1980) (en banc). The most likely way for Carriger to prove his innocence would be to show that he had no involvement in the crime whatsoever-that he was somewhere else, minding his own business. Dunbar's confession helps Carriger only if we think that all twelve imaginary jurors would swallow the preposterous tale that Dunbar and Joyce robbed and killed Robert Shaw together. Yet the record lacks even a sliver of support for this fantasy: There is no physical evidence of her involvement and she has an alibi. Absolutely no one-Carriger himself included-takes this part of Dunbar's confession seriously.[9]
 
 
 157
 Joyce's participation is not a side show-a trivial detail that can be shrugged off. So far as Carriger is concerned, this is the meat of the coconut. Let's say Dunbar was there, that he participated in the robbery, that he wielded the lethal frying pan. See maj. op. at 475. None of this proves Carriger wasn't there. The only part of Dunbar's confession that exonerates Carriger is where he claims it was Joyce (not Carriger) who was his accomplice. And for that part we have only Dunbar's unadorned words-the fabrication of a proven liar.
 
 
 158
 But it's even worse than that for Carriger. Under Schlup we cannot look just at Dunbar's confession; we must consider all post-trial evidence, including Joyce's testimony and that of her children.[10] According to Joyce, Dunbar and Carriger were in cahoots when they committed the robbery and murder. Joyce had reason to falsely accuse Dunbar, but no motive whatever to falsely accuse Carriger. Larry White, Joyce's eldest son, reported that when Dunbar let "bits and pieces" of the story slip out over the years, he included Carriger (not Joyce) as the accomplice. Asked directly about Carriger's involvement, Larry confirmed that "I picked up from Bob [Dunbar] that [Carriger] was involved with the whole thing." R.T. 7-14-87 at 58. Patience Stevens, the youngest daughter, once overheard Dunbar laughing about the murder: "Bob was laughing, and then he said that-that the guy was begging for Paris [Carriger] not to kill him and telling him that he had family and that, and that he loved them." R.T. 7-14-87 at 130. Stephanie Stevens, another daughter, confirmed that Joyce was at home in the living room-not out with Dunbar robbing the jewelry store-the afternoon of the murder. It's hard to imagine anyone-let alone twelve out of twelve reasonable jurors-who would hear the new testimony of Joyce and her children and still swallow Dunbar's confession.[11]
 
 
 159
 Short of proving that Carriger was not involved in the crime, Dunbar's vacillation might help Carriger in a subtler way by impeaching a central witness for the prosecution. So let's assume that our imaginary jury would think Dunbar was a liar and disregard his testimony altogether. This wouldn't help Carriger because the state's circumstantial case is reasonably strong and stands independent of Dunbar's trial testimony. Even looking at the case anew, with a stigma of doubt attached to everything that came out of Dunbar's mouth, reasonable jurors considering the remaining proof could and would still find plenty on which to convict Carriger of felony murder. Carriger knew Dunbar from prison and knew his reputation as an accomplished burglar. Just two days before Shaw's murder, Dunbar and Carriger made a failed burglary attempt. Carriger moved onto Dunbar's property the day before the murder. The day of the murder, Carriger called in sick and spent the day with Dunbar. The two of them visited jewelry stores, pawn shops and electronics stores; they also stopped to buy a gun. They walked into Shaw's jewelry store, where Dunbar commented that it would be an easy place to hit. These certainly appear to be the actions of two veterans planning a robbery.
 
 
 160
 There is more. Carriger's fingerprint was found on the tape used to bind Shaw's wrists. Forensic post-trial evidence shows that the print could only have gotten onto the tape at the murder scene. See pp. 490-491 infra. We also have the droplets of blood found on Carriger's boots. It's true that they were too small to test, and that they might have come from a source other than Robert Shaw. But it's not a big leap to conclude that Carriger's boots were splattered with blood at the jewelry store and that Carriger's feet were in them at the time.
 
 
 161
 And more still. Carriger has no alibi. Nor did he adequately explain his incriminating actions after the robbery. That evening, after Dunbar supposedly surprised him with the news that he had robbed a jewelry store while wearing Carriger's boots, Carriger made no effort to distance himself from Dunbar. Instead, he took the two cases-the gun case and the attache case containing the jewelry-and delivered them to Dunbar's stepdaughter. Carriger still had the key to the attache case when he was arrested.
 
 
 162
 A jury confronted with all the evidence at trial, plus Dunbar's fleeting confession, plus the post-trial testimony of Joyce and her children, plus the forensic evidence putting Carriger at the scene, would not believe every syllable of Dunbar's confession to the exclusion of everything else, as the majority does here.[12] Far more likely, a rational jury would regard all of Dunbar's testimony as unworthy of belief. But it probably would accept the explanation of Joyce and her children that Dunbar (who was living with them at the time) pressured them into providing him with an alibi at Carriger's trial, and credit Joyce's account that Dunbar and Carriger committed the crime together. Dunbar's statements about his participation in the crime-about having bashed in a man's skull-would serve to implicate Dunbar, but would also count heavily against Carriger as his accomplice. Joyce's post-trial statement would also tie up other loose ends in the record, such as how Dunbar's fingerprints got on the jewelry. All told, the case against Carriger-even with Dunbar's testimony completely omitted-is stronger now than it was at trial. It is inconceivable that twelve rational jurors hearing the case today would unanimously find Carriger innocent of any and all involvement in Shaw's murder.
 
 IV
 
 163
 The majority makes another egregious error when it discards the state court's finding that Dunbar's confession was not credible. The majority's methodology will seriously undermine the degree of deference federal courts in this circuit give to state court findings of fact in habeas proceedings. The state court here, it will be recalled, found that Dunbar told the truth when he testified at trial and again when he recanted his confession. The majority comes to the opposite conclusion, finding Dunbar's confession credible. In so doing, it sets aside state court findings of fact which come to us with a presumption of correctness; these findings must be given at least as much deference as findings by our district courts, perhaps a bit more. Indeed, it "would pervert the concept of federalism to conduct a more searching review of findings made in state trial court than we conduct with respect to federal district court findings." Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991) (citation and internal quotation marks omitted). The majority ignores this guidance and treats the state court's findings of fact with the skepticism usually reserved for findings of Administrative Law Judges and Immigration Judges. See, e.g., Washington v. Garrett, 10 F.3d 1421, 1430-31 (9th Cir.1993) (reversing ALJ); Aguilera-Cota v. INS, 914 F.2d 1375, 1381-82 (9th Cir.1990) (reversing IJ); Turcios v. INS, 821 F.2d 1396, 1400 (9th Cir.1987) (reversing IJ).
 
 
 164
 The majority first casts aspersions on the credibility findings of Judge Ryan (who handled the state post-conviction proceedings) by noting that he did not also preside at Carriger's murder trial. See maj. op. at 473-474. But appellate court deference is based on the institutional competence of the factfinder, not merely his observation of the witnesses. Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). The added concerns of finality and federalism make an even stronger case for deference on collateral review. Nor can the majority take cover in the statutory phrase "as a whole": "We greatly doubt that Congress, when it used the language 'fairly supported by the record' considered 'as a whole' intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself." Marshall v. Lonberger, 459 U.S. 422, 434-35, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983).
 
 
 165
 In any event, Judge Ryan had plenty of opportunity to observe Dunbar, Joyce, Joyce's children and other witnesses. Most significantly, of course, he saw Dunbar's courtroom confession, and six weeks later he saw the recantation. Judge Ryan was therefore practically, not merely institutionally, in a better position to figure out when Dunbar was lying. "Title 28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall, 459 U.S. at 434, 103 S.Ct. at 851.
 
 
 166
 The majority nitpicks its way through the record and concludes that "each piece of evidence is as consistent with Dunbar's confession as it is with his trial testimony." Maj. op. at 473. See also id. at 472 n. 1 ("[T]he inference that Dunbar acted alone is at least equally plausible."); id. at 474 ("Nothing establishes that the clothes had been worn by Carriger, rather than Dunbar.") id. at 474 ("The boots are no more consistent with Carriger's guilt than with Dunbar's."); id. at 478 ("other evidence ... points as directly to Dunbar as to Carriger").[13] But if the evidence supports Dunbar's trial testimony just as well as his confession, how can we reject the state court's finding that Dunbar told the truth at trial? "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511. If the majority is holding, as it seems to, that state court findings of fact will only be upheld where the record supports no other scenario, it has stepped directly in the path of a long train of contrary authority. See, e.g., Purkett v. Elem, 514 U.S. 765, 769, 115 S.Ct. 1769, 1771-72, 131 L.Ed.2d 834 (1995); Parke v. Raley, 506 U.S. 20, 35-36, 113 S.Ct. 517, 526-27, 121 L.Ed.2d 391 (1992); Burden v. Zant, 498 U.S. 433, 436-37, 111 S.Ct. 862, 864-65, 112 L.Ed.2d 962 (1991); Demosthenes v. Baal, 495 U.S. 731, 736-37, 110 S.Ct. 2223, 2225-26, 109 L.Ed.2d 762 (1990); Wainwright v. Witt, 469 U.S. 412, 434, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985); Maggio v. Fulford, 462 U.S. 111, 118, 103 S.Ct. 2261, 2264-65, 76 L.Ed.2d 794 (1983).
 
 
 167
 Worse still is the majority's hopelessly one-sided review of the record. The majority does not look to see whether there is support for the state court's presumptively correct findings; rather, it chooses only those facts and inferences that undermine those findings. Take the single most damning piece of proof against Carriger: his fingerprint on the adhesive tape used to tie up Shaw's wrists. If Carriger's print got on the tape before the murder, it could only have been on the outside of the reel, which would place it on the first few inches used to tie Shaw's wrists. Nine feet of tape were used to tie up Shaw, and most of it was found balled up in a large wad. The only way any preexisting prints could have survived on the tape is if the first six or so inches used to tie up Shaw had been left uncovered and unsmudged when eight and one-half more feet were wrapped around his wrists and wadded up into a ball. Anyone who has used tape will know this is highly unlikely. The usual way of applying tape is to stick the end piece to the object being bound-be it a duct, a package or a human wrist-and then bring the reel around the object and stick the second layer of tape on top of the first. It would be remarkable to use nine feet of tape to tie up a person's wrists yet leave the first six inches exposed. I have trouble imagining how this might be done.
 
 
 168
 The jury heard the defense's theory about the print at trial and, not surprisingly, rejected it. The state has since confirmed this common sense conclusion with expert testimony. A criminalist at the post-conviction proceedings explained that, after cutting the wad of tape into seven pieces so he could unravel it, he fit the pieces together end to end to see where Carriger's print was located. It was twenty-one and one-half inches from the end of the tape-not on the first few inches. This destroys Carriger's theory and provides strong proof that he was present and participated in the murder.
 
 
 169
 The majority agrees that the criminalist's evidence must be considered, but finds it unreliable and accords it "little weight." Maj. op. at 474. The majority points to a perceived inconsistency in the expert's testimony because the criminalist was unable to tell which end of the tape matched the end of the roll. It is difficult to understand why the majority sees this as inconsistent-either way the fingerprint is not near the end. More remarkable is how quickly my colleagues are willing to dismiss solid evidence that points directly to Carriger's guilt while blowing out of all proportion scraps of evidence, like hearsay statements in Dunbar's prison file, that might conceivably point the other way. This is not the sober, dispassionate review of the evidence Schlup calls for; it is a scavenger hunt for anything that might cast doubt on the jury's verdict.
 
 
 170
 The fingerprint evidence is exactly the kind of proof that should be given the greatest weight in making the Schlup inquiry, as the expert witness testified under oath, and Carriger's lawyer both interviewed him and cross-examined him extensively. And the expert was unequivocal in locating Carriger's print on the tape:
 
 
 171
 Q All right. Can you tell us how long the length of tape is approximately?
 
 
 172
 A Approximately eight feet, nine inches.
 
 
 173
 Q How many segments are there in that length of tape?
 
 
 174
 A Twelve.
 
 
 175
 Q Where is the segment in Exhibit 43, the latent lift segment of tape-where does that occur from the end of the metal roll of tape contained in the plastic bag in Exhibit 41?
 
 
 176
 A Approximately 21 and a half inches, ma'am.
 
 
 177
 Q To what degree of certainty are you certain of this result? Did I ask a bad question? Is there any degree of certainty that you can state that you are confident in your conclusion that you have reassembled the entire roll?
 
 
 178
 A I am certain that I have reassembled the segment of tape that was torn to make the wad, and I am certain that the latent fingerprint lift segment is in its appropriate place in relation to the length of tape and to the piece of tape on the ends of the roll of tape.
 
 
 179
 MS. FUNKHOUSER: Your Honor, at this time I would move to admit exhibits No. 41, 42, 43 and 54 for purposes of the offer of proof and I have no additional questions for this witness at this time.
 
 
 180
 THE COURT: Okay. Those exhibits are admitted for the limited purposes of the offer of proof.
 
 
 181
 R.T. 12-11-87 at 56-57.
 
 
 182
 The evidence was not excluded for unreliability, as the majority suggests. Rather, it was excluded because Carriger, at the last minute, withdrew his challenge to the fingerprint evidence. Judge Ryan therefore ruled that the testimony from the criminalist was no longer relevant:
 
 
 183
 The reason I am sustaining the defense's objection to calling these witnesses to present evidence is because since the defense has abandoned their challenge to the fingerprint testimony, that I don't think its relevant for you to present evidence, but you want to make an offer of proof to show what the evidence would be if the Court were to allow that.
 
 
 184
 R.T. 12-11-87 at 6. Following Judge Ryan's suggestion, the state presented the testimony as an offer of proof, just in case Carriger decided to challenge the fingerprint evidence later on. Carriger has now done so and the testimony of the criminalist must be accorded due weight.
 
 
 185
 The majority also relies on the fact that only one fingerprint was found on the tape: "Had Carriger left the print while binding the victim, as the state contends, it is difficult to understand how he could have left only one print." Maj. op. at 474. This is silly. We are not talking here about nine feet of tape laid out flat like an FBI fingerprint card.[14] Most of the tape was stuck to itself and rolled up in a big wad, hardly the ideal medium for latent fingerprints: "The development of fingerprints on adhesive tape has always been a challenge for latent fingerprint examiners." Advances in Fingerprint Technology 88 (Henry C. Lee & R.E. Gaensslen eds., 1994). How many recoverable prints do my colleagues expect to find on such an inhospitable surface? I find it surprising that even a single readable print was retrieved from a wad of adhesive tape cut from the body of a murder victim.
 
 
 186
 In the end, it matters not whether my view of the evidence or that of the majority prevails. Let's say the majority's view is plausible. The contrary view-held by the jury, Judge Ryan, the Arizona Supreme Court, and the district court-surely is plausible as well. What I find alarming is the majority's methodology, which is to take one view of the evidence, and one view only, ignoring the proof and reasonable inferences pointing the other way. Section 2254(d) demands far greater deference to state court judges. And not just in degree, but in basic approach: Reviewing the record "as a whole" isn't a license to draw every single inference in favor of the petitioner.
 
 
 187
 We've been reversed for this kind of thing before. In Sumner v. Mata, the Supreme Court admonished us that the presumption of correctness could not be cast aside through pro forma acknowledgment of section 2254:
 
 
 188
 Obviously, if the [Ninth Circuit] Court of Appeals ... or any other court of appeals had simply inserted a boilerplate paragraph in its opinion that it had considered the state record as a whole and concluded that the state appellate court's factual determinations were not fairly supported by the record, this objection to the judgment of the Court of Appeals could not as easily be made. Just as obviously, this would be a frustration of the intent of Congress in enacting § 2254(d).
 
 
 189
 Sumner v. Mata, 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). Each underlying fact is entitled to a presumption of correctness unless an exception to 2254(d) applies; federal courts reviewing state findings on habeas must face up to any disagreement as to each one of these facts. Compare Mata v. Sumner, 696 F.2d 1244 (9th Cir.1983), Mata v. Sumner, 649 F.2d 713 (9th Cir.1981) and Mata v. Sumner, 611 F.2d 754 (9th Cir.1979) with Sumner v. Mata, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) and Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The majority's willingness to nimbly pick its way through the evidence and come up with its own appellate factfinding bodes ill for the doctrine of deference to state court findings. The presumption of correctness is left in tatters.
 
 V
 
 190
 On the other side of the Schlup gateway, the majority discovers a Brady violation. But my colleagues gloss over a key fact: Before trial Carriger himself wrote his lawyer, Thurman Gay, alerting him to Dunbar's history as an informant and directing him to get Dunbar's prison record. Carriger's letter states in relevant part:
 
 Point # 3
 
 191
 Bobby Dunbar was the informant for the state against John Douglas Troutman for a safe burglary of the National Cash Register Company (about 1968 I think)
 
 
 192
 ...
 
 Point # 4
 
 193
 Perhaps while we are getting Dunbar's prison record we should also get a copy of mine.
 
 
 194
 Attachment to District Court Record on Appeal at 126 (April 18, 1978 letter to Thurman Gay) (emphasis added).
 
 
 195
 Brady does not require the prosecutor to direct a counter-investigation to destroy its own case. See United States v. McVeigh, 954 F.Supp. 1441, 1449 (D.Colo.1997). Accordingly, a defendant who has specific knowledge of the evidence "withheld" but fails to request it cannot claim a Brady violation. The government need not give notice sua sponte where the accused has knowledge of the documents in question. See Routly v. Singletary, 33 F.3d 1279, 1285 (11th Cir.1994); United States v. Iverson, 648 F.2d 737, 738-39 (D.C.Cir.1981); Ross v. Heyne, 638 F.2d 979, 986 (7th Cir.1980); United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir.1980); United States v. Prior, 546 F.2d 1254, 1259 (5th Cir.1977); Hampton v. United States, 504 F.2d 600, 603 (10th Cir.1974); Wallace v. Hocker, 441 F.2d 219, 220 (9th Cir.1971). The prosecutor in this case breached no duty.
 
 
 196
 Dunbar's prison file would have provided further proof that Dunbar was a snitch, a thief and a liar. Carriger alerted Gay to the existence of the file. Gay apparently decided that he had enough to impeach Dunbar. Not a wise choice, perhaps, but neither is it one for which the prosecutor must shoulder the blame under Brady. A prosecutor has no duty to investigate and turn over impeachment evidence the defense already knows about. Carriger's Brady claim fails.
 
 VI
 
 197
 This is a difficult case. The state relied heavily on the testimony of an unreliable informant. Still, its case at trial was sufficient and nothing that has come to light since the verdict ushers Carriger through the actual innocence gateway. When navigating the murky waters of "fundamental miscarriage of justice," we ought to stick close to the rules handed down by the Supreme Court and accept the guidance provided. Because I disagree with the majority's reading and application of Schlup, I dissent.
 
 
 
 [1]
 The dissent seizes upon an inconsistency between Dunbar's confession, which stated that he and Joyce committed the murder, and Joyce's recantation, which stated that Dunbar left the house alone. The dissent concludes that Joyce's recantation does not exonerate Carriger but supports the inference that Dunbar and Carriger acted together. There is no basis for this conclusion; the inference that Dunbar acted alone is at least equally plausible. There is no evidence that Dunbar and Carriger acted together to commit the murder
 
 
 [2]
 Because these claims are sufficient to dispose of Carriger's case, we need not consider his additional claims that he is entitled to resentencing based on a new mitigating circumstance, that he was incompetent to be tried or sentenced, or that his counsel at resentencing was ineffective for failing to raise the competency issues
 
 
 [3]
 Because Carriger's petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (the "Act"), we apply § 2254(d)(8) as it existed prior to its amendment by the Act. See Jeffries v. Wood, 114 F.3d 1484, 1495-96 (9th Cir.1997) (en banc); accord Lindh v. Murphy, --- U.S. ----, ----, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) ("[T]he new provisions of chapter 153 generally apply only to cases filed after the Act became effective.")
 
 
 [4]
 The dissent argues that this offer of proof is "the single most damning piece of proof," infra at 490, and concludes that even after disregarding Dunbar's testimony, "reasonable jurors ... could and would still find plenty on which to convict Carriger," infra at 487. We do not agree with the assumption that the reconstruction is reliable or that our test under Schlup is to decide how a hypothetical jury would regard each bit of new evidence. Our task is to determine whether confidence in the actual verdict is undermined. Schlup, at 314-16, 115 S.Ct. at 861
 
 
 [1]
 Arizona courts share this suspicion:
 There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character.
 State v. Krum, 183 Ariz. 288, 903 P.2d 596, 602 (Ariz.1995) (en banc), quoting State v. Sims, 99 Ariz. 302, 409 P.2d 17, 22 (Ariz.1965).
 
 
 [2]
 The law indeed accords dying declarations special treatment, at least where the statement concerns the cause of the declarant's impending death, based on the premise that one is not likely to lie so soon before Judgment. See Fed.R.Evid. 804(b)(2)
 
 
 [3]
 Some of the details of Joyce's story are subject to doubt--among other things, she testified that Dunbar took a large frying pan along to rob the jewelry store. (Shaw's wife explained at trial that a small frying pan, identified as the murder weapon, was kept on a hot plate in the store.) Joyce was obviously embellishing to make Dunbar look guilty, thereby providing special motivation for Dunbar to do the same to her
 
 
 [4]
 This standard, derived from Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649-50, 91 L.Ed.2d 397 (1986), is somewhat less strict than the standards discussed in Herrera v. Collins, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) and Sawyer v. Whitley, 505 U.S. 333, 336, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992). Before the three-judge panel Carriger's lawyer abjured Schlup and pressed only a Herrera claim:
 Q Let me ask you about the actual innocence claim. Are you making both a Herrera and a Schlup claim?
 A No. We are making a Herrera claim. We filed a memorandum accompanying the petition for habeas corpus and it spells out: This is a Herrera claim.
 Q ... With respect to the specific question you were just asked by Judge Kozinski, on pages 15 and 16 of your brief you specifically mention Schlup v. Delo and I guess I'm not quite sure how that plays into the Herrera argument you were just making.
 A ... That's there [because] that's what the District Court thought we were doing. It didn't look at the Herrera claim, it went and said, this isn't a claim, standing on its own, of actual innocence; this is a claim that was brought as a gateway under Schlup to resolve the issues of competence and Brady.
 Oral Argument (telephone) 11/29/95 10:00 a.m. Relying on this representation, the panel focused its actual innocence analysis on Herrera rather than Schlup. See 95 F.3d 755, 757-61 (9th Cir.1996). Carriger's lawyer resuscitated the Schlup claim at oral argument before the en banc court:
 Q You're talking about actual innocence. Are you talking about that in terms of both Herrera and Schlup, having Schlup act as a gateway?
 A That's exactly right.
 Oral Argument 3/27/97 10:00 a.m.
 
 
 [5]
 Under Herrera, the petitioner must make a "truly persuasive demonstration of 'actual innocence,' " while under Schlup it is sufficient to show that he is probably innocent. Compare Herrera, 506 U.S. at 417, 113 S.Ct. at 869, with Schlup, 513 U.S. at 327, 115 S.Ct. at 867
 
 
 [6]
 The source of the majority's confusion may lie in the manner in which the Schlup Court distinguished Herrera. Writing for the Court, Justice Stevens explained that when a petitioner makes a credible showing of innocence-such that a court cannot have confidence in the "result" or "outcome" of the trial-the gateway must open and the case must be considered on the merits. Schlup, 513 U.S. at 316-17, 115 S.Ct. at 861-62. The majority confuses confidence in the fairness of the proceedings with confidence in the result or outcome. Confidence in the outcome of a trial is undermined only if we are persuaded that the petitioner is innocent-even if the original jury verdict was tainted by constitutional error. This sounds remarkable at first blush, but it really isn't. To avoid swallowing up the doctrine of abuse of the writ, the miscarriage of justice inquiry set forth in Schlup emphasizes actual innocence-the outcome of the trial-rather than the fairness of the trial. Only if we are persuaded that the petitioner is actually innocent can we proceed through the gateway and then consider whether the petitioner received a fair trial
 
 
 [7]
 The majority seems to adopt the Strickland prejudice standard rather than Schlup /Carrier for Ninth Circuit actual innocence claims. Compare maj. op. at 474 n. 4 ("Our task is to determine whether confidence in the actual verdict is undermined.") with Strickland v. Washington, 466 U.S. 668, 695, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984) (holding that prejudice requires "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.") Undermining confidence in the verdict-in the sense that new evidence or flaws in the trial might have led one of the jurors to vote differently-isn't enough to open the gateway. The Schlup standard is higher, and requires the petitioner to prove that he is actually innocent. See Schlup, 513 U.S. at 327, 115 S.Ct. at 867 ("The petitioner thus is required to make a stronger showing than that needed to establish prejudice."); id. at 332-33, 115 S.Ct. at 869-70 (O'Connor, J., concurring) (fifth vote) ("This standard is higher than that required for prejudice[.]")
 
 
 [8]
 Indeed, this was a source of friction between the majority and dissent in Schlup. Justice Stevens defended the standard as manageable: "Finders of fact are often called upon to make predictions about the likely actions of hypothetical 'reasonable' actors. Thus, the application of 'more likely than not' to the habeas court's assessment of the actions of reasonable jurors is neither illogical nor unusual." Schlup, 513 U.S. at 329 n. 48, 115 S.Ct. at 868 n. 48
 
 
 [9]
 Dunbar implicated his wife throughout the "confession." Dunbar claimed that after they arrived at the store, Shaw was still there, so Dunbar bound him up, went over to the cabinets and started taking out pieces of jewelry. Dunbar then presented a vivid picture of the murder:
 I started taking things from the cabinets and I heard a muffled kind of thud or gong and I also heard some kind of screams or moans. And I ran back to the back and I saw lots of blood around Mr. Shaw and his head, and Joyce was standing there saying over and over, "I can't get caught. I can't get caught. I got kids."
 R.T. 10-30-87 at 13. Dunbar then admitted that he, too, hit Shaw with the frying pan and strangled him, but only after Joyce had struck the first blows. Id.
 In the context of Joyce's testimony and the other evidence that Carriger and Dunbar committed the crime together, Dunbar's confession can be convincingly read as the very real recollection of the crime if Carriger is substituted for Joyce as striking the first blows with the skillet.
 
 
 [10]
 Carriger also identifies hearsay evidence of Dunbar boasting to friends about how he set Carriger up. See maj. op. at 472. It's not clear if any of this is reliable enough to form the basis of a Schlup claim, but it doesn't matter because it all suffers from the same fatal flaw as Dunbar's confession: It fails to show that Carriger is actually innocent of murder, and it too suggests only that Dunbar committed the murder with Carriger and set Carriger up after the fact to take the fall by himself
 
 
 [11]
 It's even harder for me to imagine how the majority can review this record and still say that "[t]here is no evidence that Dunbar and Carriger acted together to commit the murder." Maj. op. at 472 n. 1. Is the testimony of Joyce and her children "no evidence"? This testimony alone is enough to discredit Dunbar's confession and seal Carriger's fate
 
 
 [12]
 Dunbar's explanations during this confession are the road map the majority uses to explain away all physical evidence of Carriger's involvement. See maj. op. at 473 ("Dunbar explained that he had taken the adhesive tape ..."); id. at 474 ("Dunbar testified that he gave Carriger the attache case to give to Jackie White to hold;"); id. at 474 ("Dunbar testified in his confession that the clothes he led the police to were the clothes he, Dunbar, had worn during the robbery"); id. at 474 ("[W]hen he confessed, Dunbar stated he planted Carriger's jeans in the canal"); id. at 474 ("In his confession, Dunbar testified that he discarded the clothes ..."); id. at 478 ("Dunbar, without immunity, confessed under oath to committing the murder"); id. at 478 ("Dunbar's confession explained why Carriger's fingerprint was on the tape, although Carriger was not there")
 One would hardly believe it's the selfsame Dunbar the majority describes as a "known habitual liar," id. at 465, a "habitual liar," id. at 466, a "less than reliable" informant, id. at 470, "well known ... to be a liar," id. at 470, "manipulative" and "sociopathic," id. at 471, 481, "lying," id. at 475, "vague and evasive," id. at 475, and saddled by a "long history of lying to police," id. at 479, 481.
 
 
 [13]
 The majority draws each inference in favor of Carriger. It begins by discarding the physical evidence, finding that: Carriger could not have left only one fingerprint on the tape while binding Shaw's hands, maj. op. at 473; Carriger's having the key to the attache case meant nothing, id. at 474; Dunbar wore Carriger's clothes during the robbery, id. at 474; Dunbar planted Carriger's jeans in the canal, id. at 474; Carriger's fingerprints on the gun case meant nothing, id. at 474; Dunbar wore Carriger's boots, id. at 474; and Carriger would have left recoverable fingerprints on the jewelry had he not worn gloves, id. at 474. The majority then moves on to even more speculative matters, finding that: Dunbar could not have known the details of the crime unless he participated, id. at 475; Dunbar was not shown diagrams of the store; id. at 475; Dunbar's lawyer was not interested in publicity, id. at 475; Dunbar was vague and evasive when recanting his confession, id. at 475. None of these findings had been made before in the twenty-year history of this case, and each is used to support the majority's most speculative (and contradictory) findings of all: that Dunbar was telling the truth when he confessed, id. at 475, and that he acted alone, id. at 472 n. 1. The role of the factfinders in our criminal and habeas systems demands more respect than this
 
 
 [14]
 Even those little cards aren't foolproof. Working under ideal conditions-a willing subject, a flat card clasped firmly into place, fingers drenched in printer's ink-it often takes experts several tries to produce a usable set of prints. Under less ideal conditions, obtaining a usable print is very chancy. It depends on several factors: The kind of surface on which the print might be left, how oily or dry the individual's skin is, and whether anything has smudged the print. See Advances in Fingerprint Technology 60-63 (Henry C. Lee & R.E. Gaensslen eds., 1994)